985 F.2d 1488
 NEW PORT LARGO, INC., a Florida corporation, Charles H.
Netter and Stuart D. Marr, Plaintiffs-Appellants,
New Port Largo, etc., Plaintiff,
v.
MONROE COUNTY, a political subdivision of the State of
Florida, Kenneth Sorensen, Board Member of County
Commissioners, Monroe Planning & Zoning, Donald Schloesser,
Commissioners Board, Alison Fahrer, Commissioners Board,
Curt Blair, Commissioners Board, and George Dolezal,
Commissioners Board, Defendants-Appellees,
Wilhelmenia Harvey, et al., Defendants.
NEW PORT LARGO, INC., Charles H. Netter and Stuart D. Marr,
Plaintiffs-Appellees,
New Port Largo, etc., Plaintiffs,
v.
MONROE COUNTY, a political subdivision of the State of
Florida, Defendant-Appellant,
Kenneth Sorensen, etc., et al., Defendants.
 Nos. 90-5091, 90-5327.
 United States Court of Appeals,
Eleventh Circuit.
 March 17, 1993.
 
 Coffey, Aragon, Martin, Burlington & Serota, P.A., Miami, FL, Jeffrey B. Crockett, Maurice J. Kutner, Michael R. Seward, Law Office of Michael R. Seward, Miami, FL, for plaintiffs-appellants in No. 90-5091.
 Alan G. Greer, Floyd, Pearson, Richman, Greer, Weil, Zack & Brumbaugh, P.A., Miami, FL, for Monroe Cty., Fahrer, Sorenson, Blair, Dolenzal & Schloesser.
 Randy Ludacer, Key West, FL, for Monroe County.
 Randy Ludacer, Co. Atty., Key West, FL, Robert L. Floyd, Alan G. Greer, Floyd, Pearson, Richman, Greer, Weil, Zack & Brumbaugh, P.A., Miami, FL, for defendant-appellant in No. 90-5327.
 Jeffrey B. Crockett, Coffey, Aragon, Martin, Burlington & Serota, P.A., Michael R. Seward, Law Office of Michael R. Seward, Miami, FL, for plaintiffs-appellees in No. 90-5327.
 Appeals from the United States District Court for the Southern District of Florida.
 Before TJOFLAT, Chief Judge, EDMONDSON, Circuit Judge, and DYER, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 The principal issue presented by these consolidated appeals is whether the district court erred in granting appellee's motion for summary judgment by applying the wrong tolling doctrine to appellant New Port Largo, Inc.'s (NPL) temporary regulatory takings claims, thereby holding the claims barred by the applicable statute of limitations. NPL sold the subject property two years after the enactment of the allegedly infringing regulation. The district court, observing that the regulation could cause NPL no injury thereafter, held that the applicable statute of limitations ran from the date NPL sold the property. NPL contends that the statute of limitations was tolled until the state court, in passing on the validity of the regulation, declared the regulation invalid. Based on Corn v. City of Lauderdale Lakes, 904 F.2d 585 (11th Cir.1990) (Corn III ),[1] we conclude that the district court erred. Accordingly, we vacate the district court's judgment and remand the case for further proceedings.[2]
 
 I.
 A.
 
 2
 In August 1968, the State of Florida sold a parcel of submerged land located on Key Largo's Atlantic coast to a private trust.[3] In December 1972, after the private trust filled in and prepared the land for residential construction, the Monroe County Planning and Zoning Department (the Zoning Department) zoned the property for residential duplex use (RU-2).
 
 
 3
 In September 1979, NPL purchased the property from the private trust. In November 1979, appellee Monroe County (the County) filed an application with the Zoning Department to rezone the property from RU-2 to private airport use (PA). On January 24, 1980, the Zoning Department held a hearing on the proposed rezoning and subsequently approved the County's application. NPL appealed the Zoning Department's decision to the Monroe County Board of Commissioners (the Commission). On September 11, 1980, the Commission affirmed the Zoning Department's decision.
 
 
 4
 On October 10, 1980, NPL filed a petition for a writ of certiorari in state circuit court alleging that the rezoning violated Florida law. NPL claimed that the County had not complied with the procedural requirements of its Major Development Project Ordinance, an ordinance that applies to rezonings which, as here, concern parcels of land greater than five acres. On September 9, 1982, during the pendency of its certiorari petition, NPL sold the property in question, conveying one-half undivided interests in fee simple both to TFW, Inc., a Florida corporation, and to a land trust administered by the First National Bank of South Miami. Neither of these purchasers intervened in the certiorari proceeding brought by NPL. In August 1985, NPL amended its petition to include a claim that the County had deprived NPL of its property "without offering compensation ... in violation of the constitutions and laws of the United States and of the State of Florida." NPL also claimed that the rezoning did not comply with the dimensional requirements and safety regulations for a private airport. NPL asked the court to declare the rezoning invalid, to return the property to its RU-2 zone classification, and to provide any further relief the court deemed appropriate.
 
 
 5
 On January 2, 1986, the state court granted NPL's petition to invalidate the rezoning ordinance. The court found that the County's rezoning of the property to PA violated the dimensional requirements of a private airport zone, the County had not complied with the procedures of its Major Development Project Ordinance, and the rezoning "would deprive [NPL] of any reasonable use" of its property. Accordingly, the court declared invalid and quashed the County's rezoning of the subject property. Because the court found that the County had acted in good faith in pursuing the rezoning, however, it did not award damages to NPL.[4] Neither party sought appellate review of the court's decision.
 
 B.
 
 6
 On July 7, 1987, NPL brought this action in the United States District Court for the Southern District of Florida, seeking, among other forms of relief, just compensation for the alleged temporary regulatory "taking" of its property[5] both under 42 U.S.C. § 1983 (1988), and directly under the Fifth Amendment as made applicable to the states by the Fourteenth Amendment.[6] NPL alleged that the taking occurred when the County rezoned the property to a PA zone classification. The County filed a motion to dismiss all counts of the complaint asserting that NPL's takings claims were barred by res judicata and by the statute of limitations. See New Port Largo, Inc. v. Monroe County, 706 F.Supp. 1507, 1511 (S.D.Fla.1988).
 
 
 7
 On November 21, 1988, the district court found that the state court had not rendered a final adjudication on NPL's takings claims, and therefore rejected the County's res judicata defense. Id. at 1512-13 & n. 3; see Corn III, 904 F.2d at 587 (res judicata defense based on state petition attacking the validity of ordinances did not preclude later claim for just compensation). In considering the County's statute of limitations argument, the district court reasoned that all just compensation claims should be treated similarly, regardless of whether the claims allege a complete taking or a temporary regulatory taking. New Port Largo, 706 F.Supp. at 1516-17. The court opined that in all actions to rectify the government's taking of private property, the applicable "statute of limitations runs from the time of [the government's] appropriation." Id. at 1516. The court suggested that the statute of limitations can be tolled only if the government continues to violate the law by new acts of appropriation.[7] Id. at 1517.
 
 
 8
 Utilizing this "continuing wrong" tolling doctrine, the court initially held that the last act of appropriation by the County occurred on April 9, 1985, when the state district court of appeal finally quieted title to the subject property in NPL.[8] Id. at 1518. After holding that the applicable statute of limitations in takings actions runs for four years,[9] here until April 9, 1989, the district court found that NPL's filing of its takings claims on July 7, 1987, fell well within the statutory period. Id.
 
 
 9
 On July 17, 1989, the County filed a motion for summary judgment seeking reconsideration of the court's determination that the last act of appropriation occurred on April 9, 1985, and arguing anew that NPL's regulatory takings claims were barred by the statute of limitations. Utilizing the district court's tolling doctrine, the County contended that NPL's sale of the subject property on September 9, 1982, precluded any tolling of the statute of limitations beyond that date by additional wrongful acts of appropriation by the County. As viewed by the County, NPL's action accrued on September 9, 1982, and the appropriate statute of limitations for NPL's action ran out four years later, on September 9, 1986, almost a year prior to the filing of NPL's claims in district court on July 7, 1987. The county concluded that NPL's claims were time-barred. The district court, adopting the County's argument, granted the County's motion for summary judgment on December 22, 1989.[10] NPL appealed, No. 90-5091, and the County cross-appealed the district court's denial of attorneys' fees, No. 90-5327.
 
 II.
 A.
 
 10
 Our review of the applicable statute of limitations doctrine is a question of law subject to de novo review. Atlantic Land & Improvement Co. v. United States, 790 F.2d 853, 857 (11th Cir.1986). The determination of the accrual date of a federal regulatory takings claim depends on the occurrence of two events. First, state judicial authorities must make a final determination on the status of the subject property affected by the zoning ordinance. Corn III, 904 F.2d at 588 (holding that a regulatory takings claim is not mature until a state appellate court affirmed issuance of mandamus invalidating zoning ordinance); Norco Constr., Inc. v. King County, 801 F.2d 1143, 1145 (9th Cir.1986) (finding that a just compensation claim matures only after "planning authorities and state review entities make a final determination on the status of the property"). But cf. Williamson County Regional Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 192-93, 105 S.Ct. 3108, 3119-20, 87 L.Ed.2d 126 (1985) (holding that a takings claim ripens after final determination by the initial decisionmaker). Second, the property owner must be denied an adequate postdeprivation remedy. Williamson, 473 U.S. at 195, 105 S.Ct. at 3121. For statute of limitations purposes, both events are necessary for the accrual of a property owner's takings claim.
 
 
 11
 First, if NPL had remained the owner of the subject property, then its takings claims could not have accrued for purposes of the statute of limitations until the state judicial authorities had made a final determination on the status of the property. See Corn III, 904 F.2d at 588. In the instant case, the state circuit court entered a final judgment on January 2, 1986, invalidating the County's rezoning of the property. The parties did not appeal. The state circuit court's judgment, therefore, was the state's final determination on the status of the subject property. See id.
 
 
 12
 Second, NPL must show that the state denied it adequate procedures through which NPL could seek compensation for the alleged taking. "[T]he State's action is not 'complete' in the sense of causing a constitutional injury 'unless or until the State fails to provide an adequate postdeprivation remedy for the property loss.' " Williamson, 473 U.S. at 195, 105 S.Ct. at 3121 (quoting Hudson v. Palmer, 468 U.S. 517, 532 n. 12, 104 S.Ct. 3194, 3203 n. 12, 82 L.Ed.2d 393 (1984)). At the time of the state circuit court's final judgment,[11] Florida courts did not recognize damages claims arising from regulatory takings. See Dade County v. National Bulk Carriers, Inc., 450 So.2d 213, 216 (Fla.1984).[12] Florida law, therefore, provided no postdeprivation remedy for NPL's claimed deprivations.
 
 
 13
 Assuming NPL's continuous and uninterrupted ownership of the land, NPL's claims would have accrued on January 2, 1986, the date of the final judgment. At that time, both events required by Williamson to establish accrual of the takings claims had occurred. Applying Corn III, no matter which statute of limitations period urged by the parties governs the claims, NPL timely filed its takings claims in district court on July 7, 1987.[13]
 
 B.
 
 14
 The unique feature of this case is, however, that NPL sold its property three and one-half years before the state circuit court reached a final determination on the status of the subject property. The district court reasoned that this sale ended the toll on NPL's otherwise properly tolled claims because no new appropriation of the property could befall NPL after the date of sale. The district court's analysis therefore assumes, for purposes of the statute of limitations, that the date of sale determined the accrual date of NPL's claims.[14]
 
 
 15
 Corn III 's approach to tolling the statute of limitations in regulatory takings cases, however, compels the opposite conclusion. First, the state court allowed NPL's state claims to proceed to a final judgment. This necessarily implies that NPL demonstrated sufficient injury-in-fact to litigate the scope and legality of the County's rezoning of the subject property.
 
 
 16
 Second, under Corn III, takings claims can accrue, if ever, only after the state judiciary's final determination on the status of the subject property. Corn III, 904 F.2d at 588. NPL's injury may have ended when it sold the property, but, under Corn III, NPL's claims did not accrue until the state proceedings had concluded.
 
 
 17
 We do not hold that the sale of the property in this case has no relevance to NPL's takings claims. The sale may prove relevant to a determination of the amount of compensation that would be "just" if NPL does establish that it is entitled to compensation for the taking of its property. Rather, we hold today that the state's invalidation of the zoning ordinance, not NPL's sale of the property, determines of the accrual date of NPL's action.III.
 
 
 18
 For the foregoing reasons, we find that NPL's temporary regulatory takings claims were tolled until January 2, 1986, when the state circuit court invalidated the County's rezoning of the subject property. NPL's claims are not time-barred. Accordingly, we vacate the district court's judgment and remand this case for further proceedings.
 
 
 19
 VACATED and REMANDED.
 
 TJOFLAT, Chief Judge, specially concurring:
 
 20
 Because we are bound to follow circuit precedent as established by Corn v. City of Lauderdale Lakes, 904 F.2d 585 (11th Cir.1990) (Corn III ), I concur in the judgment of the court.[1] I write separately to express my concern that Corn III 's test for determining the accrual date of Fifth Amendment claims for just compensation directly conflicts with the Supreme Court's decision in Williamson County Regional Planning Commission v. Hamilton Bank, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985).
 
 A.
 
 21
 Williamson held that two determinative events govern the ripeness of a just compensation claim: (1) when the decisionmaker "charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue," 473 U.S. at 186, 105 S.Ct. at 3116,[2] and (2) when "the owner has unsuccessfully attempted to obtain just compensation through the procedures provided by the State for obtaining such compensation,"[3] id. at 195, 105 S.Ct. at 3121 (citing Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), overruled on other grounds by Daniels v. Williams, 474 U.S. 327, 330-31, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986));[4] see also MacDonald, Sommer & Frates v. Yolo County, 477 U.S. 340, 348-50, 106 S.Ct. 2561, 2565-66, 91 L.Ed.2d 285 (1986).[5] I am concerned only with Corn III 's mistreatment of Williamson 's first "final decision" requirement.
 
 
 22
 By requiring a final decision by the initial decisionmaker, Williamson simply recognized that the decisionmaker's definitive position on the status of the property establishes both the occurrence and magnitude of the "interfer[ence] with [the property owner's] reasonable investment-backed expectations." Williamson, 473 U.S. at 191, 105 S.Ct. at 3119 (citing Penn Central Transp. Co. v. New York City, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978)). In MacDonald, Sommer & Frates, the Court reviewed its prior decisions in Williamson, Agins v. Tiburon, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980) (finding takings claim ripe where an application for improvements not sought), and San Diego Gas & Electric Co. v. San Diego, 450 U.S. 621, 101 S.Ct. 1287, 67 L.Ed.2d 551 (1981) (lacking jurisdiction where judgment not final), and concluded that "[o]ur cases uniformly reflect an insistence on knowing the nature and extent of permitted development before adjudicating the constitutionality of the regulations that purport to limit it." 477 U.S. at 349-52, 106 S.Ct. at 2566-67. MacDonald emphasized that courts need sufficient information concerning the degree of infringement as a prerequisite to deciding whether compensation is due. Id. at 348-49, 106 S.Ct. at 2566. Indeed, MacDonald established that a constitutional injury does not occur until the relevant decisionmaker renders its final determination on "the type and intensity of development legally permitted on the subject property." Id. at 348, 106 S.Ct. at 2566.
 
 B.
 
 23
 Corn III recognized that a federal claim accrues when the plaintiff knows or has reason to know of the injury that provides the basis of the action, and that a constitutional injury occurs at the same time that the takings claim ripens. 904 F.2d at 588 (citing Norco Constr., Inc. v. King County, 801 F.2d 1143, 1145 (9th Cir.1986)); see also Biddison v. City of Chicago, 921 F.2d 724, 728 & n. 5 (7th Cir.1991) (just compensation claim accrues when it ripens); Norco, 801 F.2d at 1146 (rejecting date ordinance passed as accrual date, and stating "the same considerations that render a [42 U.S.C. § 1983] claim premature prevent accrual of a claim for limitations purposes"); McMillan v. Goleta Water Dist., 792 F.2d 1453, 1457 (9th Cir.1986), (accrual occurs when claim ripe under Williamson, not when a property owner's rights are interrupted by the regulation), cert. denied, 480 U.S. 906, 107 S.Ct. 1348, 94 L.Ed.2d 519 (1987); cf. Agins, 447 U.S. at 260, 100 S.Ct. at 2141 (mere enactment of ordinance does not constitute taking). When Williamson 's two-prong test is met, the injury is complete, and the claim accrues for purposes of the statute of limitations.[6] Thus, if a state does not provide adequate procedures through which a property owner may obtain just compensation, the infringement ripens into a constitutional injury when the initial decisionmaker reaches a final determination.
 
 
 24
 The Corn III court erred by improperly expanding Williamson 's final decision requirement so that accrual is postponed until "state review entities"--rather then the initial decisionmakers--"have made a final determination on the status of the subject property." Corn III, 904 F.2d at 588 (quoting Norco, 801 F.2d at 1145). Hence, under Williamson, a federal takings claim ripens as soon as the initial decisionmaker renders a final decision. In contrast, under Corn III, a federal takings claim ripens only after the property owner has exhausted all legal means of challenging the ordinance, which in both the instant case and Corn III represented litigation that did not address the takings question but instead might have clarified the damages resulting from the taking. Corn III 's exhaustion requirement thus postpones the availability of a federal forum for a property owner's just compensation claims that are ripe under Williamson. Corn III provides, and I intuit, no rational explanation for this extension of Williamson.[7]
 
 
 25
 In discussing the preclusive effects of a prior state mandamus proceeding on the plaintiff's just compensation claim, Corn III presented its expanded finality requirement outside of the statute of limitations context:
 
 
 26
 [u]nder both state and federal law, the taking claim is supplemental to the state proceedings on the propriety of the zoning regulation and is not mature until the propriety or impropriety of the zoning regulation has been finally determined. See, e.g., MacDonald, Sommer & Frates v. Yolo County, 477 U.S. 340, 350, 106 S.Ct. 2561, 2566, 91 L.Ed.2d 285 (1986) (damage action not available until court decides separately filed mandamus action and gives county an opportunity to provide adequate compensation).[8]
 
 
 27
 Corn III, 904 F.2d at 587. This language suggests that Corn III simply confused exhaustion of state procedures for obtaining compensation (which Williamson requires) with exhaustion of judicial and administrative review of the regulation itself (which Williamson does not require). Indeed, Williamson specifically rejected the notion that plaintiffs must exhaust state review procedures before their takings claims ripen.
 
 
 28
 The question whether administrative remedies must be exhausted is conceptually distinct, however, from the question whether an administrative action must be final before it is judicially reviewable.... While the policies underlying the two concepts often overlap, the finality requirement is concerned with whether the initial decision maker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate.
 
 
 29
 Williamson, 473 U.S. at 192-93, 105 S.Ct. at 3119-20 (citations omitted) (emphasis added); see also Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1574 n. 8 (11th Cir.1989); cf. East-Bibb Twiggs Neighborhood Ass'n v. Macon Bibb Planning & Zoning Comm'n, 896 F.2d 1264, 1266 (11th Cir.1989). Resort to state review procedures may provide a remedy, including invalidation of the regulation, and, therefore, may change the amount of just compensation claimed by the property owner. The resolution of state review procedures, however, will not alter that fact that a taking, and thus a constitutional injury, may have occurred. Nevertheless, Corn III requires property owners to engage in protracted, and possibly futile, litigation in state courts before the property owners can repair to federal court to vindicate their federal right to just compensation. With no redeeming quality to support Corn III 's approach, I believe Corn III improperly expanded Williamson 's final decision requirement for purposes of determining the accrual date of a just compensation claim.
 
 C.
 
 30
 Because the state did not provide New Port Largo (NPL) with procedures for obtaining just compensation, demand upon the state would have been futile.[9] See ante at 1493-94 & n. 12. NPL's claim, therefore, accrued when the Monroe County Planning and Zoning Department reached a final determination on the status of the property. This issue cannot be resolved based on the record on appeal.[10] But for Corn III, I would have remanded this case to the district court to resolve this issue.
 
 
 31
 EDMONDSON, Circuit Judge, specially concurring:
 
 
 32
 I concur in the judgment.
 
 
 33
 As the author of the opinion in Corn v. City of Lauderdale Lakes, 904 F.2d 585 (11th Cir.1990) ("Corn III "), I think some of Chief Judge Tjoflat's criticisms of the words used in that opinion are valid.[1] I write separately to stress that the Corn III decision still seems right to me and that the holding--as opposed to the opinion--in Corn III conflicts in no way with the holding in Williamson County Regional Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). I also think that the Chief Judge generally gives Corn III more credit as a sweeping and powerful precedent than it deserves. As binding authority, Corn III, like all judicial decisions, is inherently limited to the facts of the case then before the court and the questions presented to the court in the light of those facts. What was decided in Corn III does need to be stripped of some obscuring and confusing dicta. And, I am contrite about there being a need to do that.
 
 
 34
 The Supreme Court decided Williamson under the ripeness doctrine. The Court held that a developer's failure to use available procedures to seek variances or to avail itself of state procedures for awarding just compensation meant that the developer's taking claim was premature. 473 U.S. at 193, 105 S.Ct. at 3120; see also, MacDonald, Sommer & Frates v. Yolo County, 477 U.S. 340, 350, 106 S.Ct. 2561, 2567, 91 L.Ed.2d 285 (1986) (discussing Williamson ). Williamson said nothing, much less made law, about the accrual of takings claims for limitations purposes or, put differently, about when limitations run against a landowner whose land is taken.
 
 
 35
 Corn III, in contrast, did decide whether the statute of limitations barred a developer's temporary taking claim. The Corn III facts are important. Very important, the federal court case for compensation for a temporary taking of property followed state court litigation in which the landowner had attacked as invalid and the local government had defended as valid certain ordinances. Almost six years passed between the time the local government finalized the offending zoning ordinances in July 1977 and the time a state appellate court finally invalidated the ordinances in February 1983. See City of Lauderdale Lakes v. Corn, 427 So.2d 239 (Fla. 4th DCA 1983). Seeking compensation for the temporary taking, Corn filed his federal suit less than a year after the state appellate court's decision.[2] The City argued that a four-year limitations period applied and barred Corn's federal action. 904 F.2d at 588. We held that no statute of limitations barred the federal temporary taking claim. Id. I believed this conclusion to be correct when I wrote the Corn III opinion. I believe it to be correct now.
 
 
 36
 Most important, Corn III did not decide (because it was unnecessary to decide) when Corn's taking claim first became ripe or mature for federal adjudication.[3] Anything the language of the Corn III opinion may imply about maturity or ripeness (the Williamson kind of issue) for Corn's claim is dicta.
 
 
 37
 The writing of a judicial opinion is mostly an experiment. Later events test the soundness of what was written; and new cases with new circumstances often show that an earlier opinion needs clarification or explanation. This need exists because, as Cardozo said, judge-made law is a chain forged link by link, that is, case by case.[4] The nature of future cases is unknowable; and, as a result, for judges to think much about circumstances except those immediately before the court is counterproductive. Attempts to create broad propositions of law based upon one case are, I think, almost always wrong. And there should be a presumption that judges mean to do no more than to decide the case before them.[5]
 
 
 38
 Looking back at the Corn III opinion, I see that it drew too much from Norco Constr., Inc. v. King County, 801 F.2d 1143 (9th Cir.1986). E.g., Corn III, 904 F.2d at 588 (" '... the same considerations that render a claim premature prevent the accrual of a claim for limitations purposes ...' " (quoting Norco, 801 F.2d at 1146)). Words in the Corn III opinion that encourage the inference that the moment for starting the running of a limitations period and the first moment of ripeness for federal adjudication must occur at the same time were unnecessary to the Corn III decision.
 
 
 39
 The holding of Corn III and, therefore, its binding power as precedent, comes not from what the opinion says or its words imply, but from what Corn III decided considering the facts then before the court: the statute of limitations had not run. In essence, Corn III 's holding would have been the same if I had written something more like Gordon v. City of Warren, 579 F.2d 386, 391-92 (6th Cir.1978).[6] In Gordon, on facts materially similar to those in Corn, the court held that the statute of limitations on the federal taking claim did not start to run until the state appellate court had ruled that the pertinent zoning ordinance was invalid. Briefly stated, the Gordon court said that the local government's acts in defending its ordinance in court were, themselves, continuous acts of taking that extended the limitations period: in effect, a continuing wrong. I now think the Gordon opinion better explains what the court in Corn III decided and did, and I wish I had written the Corn III opinion accordingly. But, for law-of-the-circuit purposes, a study of Corn III--and every other precedent--ought to focus far more on the judicial decision than on the judicial opinion.[7]
 
 
 40
 There is no conflict between the law established by the Corn III decision on whether limitations bar federal temporary taking claims when the landowner has first undertaken to attack the offending land use ordinance in state court, and the law established in Williamson--on which I agree with the Chief Judge as near as I can tell--about the prematurity or unripeness of claims.
 
 
 41
 Neither the holding in Corn III, nor even the words in the opinion, require that "property owners [must] engage in ... litigation in state courts before the property owners can repair to federal court to vindicate their federal right to just compensation." Tjoflat, C.J., concurring, at 1498. The reality is that Corn III dealt with a landowner who had, in fact, already engaged in state court litigation before the landowner came to federal court. Considering those facts, all that Corn III held was that the landowner's federal court claim to just compensation was not barred by the statutes of limitation. Given the limits of Corn III 's holding, I see no cause to expend scarce judicial resources, for example, to convene the court en banc, to address an abstract, hypothetical "conflict" with Williamson inferred from words that were dicta in Corn III.[8]
 
 
 42
 As I end, I need to write on a different point. The Chief Judge says that taking claims can become ripe earlier than some words in the Corn III opinion suggest. I do not understand (but I fear someone might) the Chief Judge to say that he thinks the statute of limitations must begin to run as soon as a taking claim first becomes ripe for adjudication in federal court. No Supreme Court case so holds. And, I say that no good reason exists why that should be the law.
 
 
 43
 As a jurisprudential matter, the doctrine of ripeness rests on different considerations than do statutes of limitation. The ripeness doctrine concerns federal courts' constitutional authority to hear only "cases or controversies" and the corollary duty not to interfere with other arms of government until there is a case or controversy fit for adjudication. In contrast, statutes of limitation concern litigants' interests: the time at which the plaintiff's duty to pursue his claims promptly attaches, and, from the defendant's perspective, the time at which the rights to speedy trial and to avoid stale claims become an enforceable bar. Therefore, statutes of limitation serve familiar purposes distinct from ripeness considerations. And it is not strange that a matter may become ripe and yet the statute does not start to run.
 
 
 44
 As a practical matter, we also want, in taking cases based on local land use regulation, no rule that makes landowners feel that it is risky to use the state courts to do a task for which the state courts are extremely well suited: to determine the validity or invalidity of the land use regulation. The landowners who go into state court are neither sleeping on their rights nor lulling local governments into thinking there is no problem. If landowners suspect that the statute of limitations may run on their federal compensation claims while they are in state courts they might either always ignore the state courts and come directly to federal court, or file in both state and federal court at the outset. Either way, we add to the workload of the federal courts needlessly and probably increase the likelihood that federal courts will be interfering in local land use determinations. It is one thing to be open to ripe taking claims; it is another to drive to federal courts in the first instance attacks on land use regulations. So, Corn III 's holding (that the statute of limitations will not run on a taking claim while state court litigation is underway to determine the validity of the underlying local regulation) seems like a good rule even if the taking claim became ripe for federal adjudication earlier.
 
 
 
 [1]
 Issues resolved by prior panels of this court are binding on subsequent panels. See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc). Corn III is this circuit's only decision addressing the accrual date of a just compensation claim, and we are bound by it
 
 
 [2]
 On cross-appeal, the County claims that the district court abused its discretion in denying its claim for attorneys' fees under 42 U.S.C. § 1988. The County's proffered support found in Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421-22, 98 S.Ct. 694, 700-01, 54 L.Ed.2d 648 (1978), however, is its own undoing. The County concedes that for a party to receive attorneys' fees under section 1988 it must be the prevailing party and, further, the nonprevailing party's claim must be "frivolous, unreasonable, or without foundation...." Id. at 421, 98 S.Ct. at 700. Given that we remand this case, it is obvious that the County has not satisfied either requirement
 Should we hold today that NPL's takings claims are not time-barred, both parties ask this court to decide NPL's takings claims, which were not reached below, and a host of related issues necessary to resolve those claims. These issues run the gamut from deciding whether there was a "taking" in this case to whether the subsequent purchasers properly assigned their takings claims to NPL on July 24, 1989, and, if so, whether the statute of limitations has run on those claims. Although a final judgment has been entered, and it is therefore permissible for this court to address the merits of the takings issue on appeal, we note that the pretrial stipulation, "Statement of Issues of Fact Which Remain to Be Litigated" p 24, identifies the takings issue as a question of fact. We decline the parties' invitation to decide these factual issues. By remanding, we leave these issues to the district court.
 
 
 [3]
 The brief statement of the facts in the text presents only those facts pertinent to the issues presented on appeal. A full recitation of the parties' interaction is contained in the district court's November 21, 1988 opinion. See New Port Largo, Inc. v. Monroe County, 706 F.Supp. 1507 (S.D.Fla.1988)
 
 
 [4]
 See Corn III, 904 F.2d at 586-87 ("we note[ ] that Florida courts recognize[ ] no money-damage claims for 'good faith, albeit confiscatory, zoning activities' ") (quoting Corn v. City of Lauderdale Lakes, 816 F.2d 1514, 1519 (11th Cir.1987) (Corn II ))
 
 
 [5]
 In First English Evangelical Lutheran Church v. City of Los Angeles, the Supreme Court held that the invalidation of a zoning ordinance, "though converting the [regulatory] taking into a 'temporary' one, is not a sufficient remedy to meet the demands of the Just Compensation Clause," 482 U.S. 304, 319, 107 S.Ct. 2378, 2388, 96 L.Ed.2d 250 (1987), and held that "no subsequent action of the government can relieve it of the duty to provide compensation for the period during which the taking was effective," id. at 321, 107 S.Ct. at 2389
 
 
 [6]
 We distill from NPL's artless pleadings, drawn in "shotgun" fashion, a Fifth Amendment claim asserted through the Fourteenth Amendment's Due Process Clause
 As the court read it, NPL's complaint sought relief in eleven separate counts against twenty-nine defendants.
 The first three counts are for violations of the Federal Civil Rights Acts, with Count I alleging a violation of 42 U.S.C. § 1983, Count II alleging a violation of 42 U.S.C. § 1985, and Count III alleging a violation of 42 U.S.C. § 1986. The remaining counts are pendant [sic] state law claims, with Count IV alleging an unjust taking, Count V asserting an abuse of process claim, Count VI a malicious prosecution claim, Count VII a disparagement of title claim, Count VIII a tortious interference claim, Count IX an intentional infliction of emotional stress [sic] claim, Count X a negligent infliction of emotional stress [sic] claim, and Count XI a broad-based conspiracy claim.
 New Port Largo, 706 F.Supp. at 1511. Through a joint stipulation of the parties, see id. at 1511 n. 2, and the district court's order of November 21, 1988, id. at 1524-25, all claims, except for count I as to the defendant Monroe County, were dismissed. The district court, however, granted NPL leave to amend counts IV, VII, IX, X and XI. Id. at 1525. NPL only amended count IV, restating its claim under the Fifth Amendment's Takings Clause. Additional voluntary and court-ordered dismissals left only one plaintiff, NPL, one defendant, Monroe County, and two counts, count I, the 42 U.S.C. § 1983 claim, and count IV, as amended, the federal takings claim. These appeals, brought pursuant to 28 U.S.C. § 1291 (1988), address only the dismissal on December 22, 1989, of the two remaining claims as time-barred, see infra part II, and the district court's denial of Monroe County's motion for an award of attorney's fees pursuant to 42 U.S.C. § 1988 (1988), see supra note 1.
 
 
 [7]
 The district court termed this tolling doctrine the "continuing wrong" doctrine, New Port Largo, 706 F.Supp. at 1515, and stated:
 [t]his court holds that the focus of the continuing wrong doctrine should be on the defendants' purported wrongful activities, and not upon the plaintiffs' alleged suffering. Accordingly, if the defendants' activities constitute a continuing or additional violation of the law, then the doctrine applies; however, if the defendants' activities do not constitute a continuing violation, then the doctrine does not apply, irrespective of the fact that the plaintiffs' harm from the defendants['] initial violation may continue.
 Id. at 1516.
 
 
 [8]
 Monroe County v. New Port Largo, Inc., 467 So.2d 757 (Fla.Dist.Ct.App.1985)
 
 
 [9]
 In finding that NPL's takings claims have a four-year statute of limitations, the district court applied Wilson v. Garcia, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). See New Port Largo, 706 F.Supp. at 1514. In Wilson, the Supreme Court first enunciated the doctrine that requires federal district courts to apply the most appropriate or most analogous state statute of limitations to actions under 42 U.S.C. § 1983. Wilson, 471 U.S. at 266-68, 105 S.Ct. at 1942-43. The court held that the most analogous state statute of limitations was the limitations period for personal injury. Id. at 276, 105 S.Ct. at 1947. But see Byrd v. MacPapers, Inc., 961 F.2d 157, 159 n. 1 (11th Cir.1992), which cites Reed v. United Transportation Union, 488 U.S. 319, 323-24, 109 S.Ct. 621, 624-25, 102 L.Ed.2d 665 (1989), as recognizing a narrow exception to Wilson when a "more closely analogous federal statute of limitations exists that would better serve the federal policy interests involved."
 Subsequently, the Supreme Court applied the same analysis to 42 U.S.C. § 1981 actions. See Goodman v. Lukens Steel Co., 482 U.S. 656, 660-62, 107 S.Ct. 2617, 2620-21, 96 L.Ed.2d 572 (1987). The circuits soon followed suit and applied this approach to takings claims brought directly under the Constitution, see, e.g., Bieneman v. City of Chicago, 864 F.2d 463, 467-70 (7th Cir.1988), cert. denied, 490 U.S. 1080, 109 S.Ct. 2099, 104 L.Ed.2d 661 (1989), and to tort actions brought directly under the Fourth Amendment (Bivens actions), see, e.g., Chin v. Bowen, 833 F.2d 21, 23-24 (2d Cir.1987); McSurely v. Hutchison, 823 F.2d 1002, 1005-06 (6th Cir.1987), cert. denied, 485 U.S. 934, 108 S.Ct. 1107, 99 L.Ed.2d 269 (1988). But cf. Gibson v. United States, 781 F.2d 1334, 1342 n. 5 (9th Cir.1986), cert. denied, 479 U.S. 1054, 107 S.Ct. 928, 93 L.Ed.2d 979 (1987).
 Although Florida has no personal injury statute of limitations per se, the district court held that the four year limitations period found in Fla.Stat. § 95.11(3)(a) (negligence), (o ) (intentional tort), and (p) ("[a]ny action not specifically provided for in these statutes") (1989 & Supp.1990), was the most appropriate to apply to NPL's takings claims because these actions were the most analogous state actions to a claim for personal injury. New Port Largo, 706 F.Supp. at 1514-15.
 
 
 [10]
 The court stated:
 NPL's claims against Monroe County for harm NPL sufferred [sic] while it owned the property began to run on September 9, 1982 under the applicable statute of limitations. NPL had four years within which to file its claims based on the harm done to it while it held the property--until September 9, 1986. On July 7, 1987, NPL filed its complaint in this action. This filing occurred ten-months late. NPL's claims are time-barred.
 
 
 [11]
 Williamson stated that the Just Compensation Clause of the Fifth Amendment only requires "that a reasonable, certain and adequate provision for obtaining compensation exist at the time of the taking. " 473 U.S. at 194, 105 S.Ct. at 3120 (references and internal quotations omitted) (emphasis added); see also Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1016, 104 S.Ct. 2862, 2879-80, 81 L.Ed.2d 815 (1984)
 
 
 [12]
 Eleventh Circuit panels disagree as to whether Florida now recognizes a cause of action for damages wrought by regulatory takings. Compare Lake Lucerne Civic Ass'n v. Dolphin Stadium Corp., 878 F.2d 1360, 1370 (11th Cir.1989) (no cause of action), cert. denied, 493 U.S. 1079, 110 S.Ct. 1132, 107 L.Ed.2d 1038 (1990), A.A. Profiles, Inc. v. City of Ft. Lauderdale, 850 F.2d 1483, 1486-88 & n. 3 (11th Cir.1988) (same), cert. denied, 490 U.S. 1020, 109 S.Ct. 1743, 104 L.Ed.2d 180 (1989), and Corn II, 816 F.2d at 1520 (same) with Executive 100, Inc. v. Martin County, 922 F.2d 1536, 1542 (11th Cir.) (citing Joint Ventures, Inc. v. Department of Transp., 563 So.2d 622, 622 (Fla.1990), as recognizing inverse condemnation action), cert. denied, --- U.S. ----, 112 S.Ct. 55, 116 L.Ed.2d 32 (1991); see also Villas of Lake Jackson, Ltd. v. Leon County, 796 F.Supp. 1477, 1481-83 (N.D.Fla.) (recognizing Corn II, but following Executive 100 ); Barima Inv. Co. v. United States, 771 F.Supp. 1187, 1189 (S.D.Fla.1991), aff'd, 959 F.2d 972 (11th Cir.1992)
 Similarly, Florida District Courts of Appeal have not settled on a single rule. Compare Monroe County v. Gonzalez, 593 So.2d 1143, 1145 (Fla.Dist.Ct.App.1992) (finding inverse condemnation remedy), Orlando/Orange County Expressway Auth. v. W & F Agrigrowth-Fernfield, Ltd., 582 So.2d 790 (Fla.Dist.Ct.App.) (axiomatic that inverse condemnation exists under United States Constitution), review denied, 591 So.2d 183 (1991) and Glisson v. Alachua County, 558 So.2d 1030, 1035 (Fla.Dist.Ct.App.) review denied, 570 So.2d 1304 (Fla.1990) with Lee County v. Morales, 557 So.2d 652, 656 (Fla.Dist.Ct.App.), (without reference to First English, applied National Bulk Carriers to reject inverse condemnation claim), review denied, 564 So.2d 1086 (Fla.1990).
 
 
 [13]
 On appeal, NPL asks us to apply a seven-year statute of limitations to its takings claims, arguing that a claim for the taking of property is most analogous to a state claim for adverse possession. See Fla.Stat. § 95.12 (real property actions). Because we find that NPL's action was tolled until the state circuit court's final judgment was entered on January 2, 1986, the action was timely under either appellant's proposed statute of limitations or appellee's adoption of the district court's approach. See supra note 9 and accompanying text. Accordingly, we decline to decide which statute of limitations applies to this action
 
 
 [14]
 The Supreme Court never has addressed directly the effect of the sale of property on the accrual date of a takings claim. See Pennell v. City of San Jose, 485 U.S. 1, 8 n. 4, 108 S.Ct. 849, 855 n. 4, 99 L.Ed.2d 1 (1988) (declining to determine whether appellant's sale and repurchase of property affected his standing)
 
 
 [1]
 Under Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), a prior panel's holdings can only be overruled by the court sitting en banc. Judge Edmondson, in his special concurrence, argues that because application of what he considers to be the "correct" standard to Corn III 's facts would require the same result as was reached in that case, the rationale applied in Corn III is merely obiter dictum. It seems odd, however, that when an earlier decision incorrectly states a proposition, the determination of whether that proposition constitutes binding precedent depends on (1) the fortuity of the actual facts in the earlier case as applied to the panel's "correct" standard, (2) whether those facts are available (so that the "correct" standard can be applied to the earlier case), and (3) the "correct" standard ultimately chosen by a subsequent panel. With Judge Edmondson's approach, a panel would have a fair chance of being able to ignore, as dictum, propositions with which it disagrees. I cannot believe that such an approach can do justice to the values furthered by the doctrine of stare decisis as expressed in Bonner. I agree with Judge Edmondson that the facts of a case define the controversy to be resolved by the court. I disagree, however, that once these facts are presented, and a standard of law applied to them, a subsequent panel can ignore application of that standard. Corn III decided what standard of law applies to determine the accrual of a takings cause of action for statute of limitations purposes. Corn III, therefore, is the law of the circuit and will remain the law unless the court, sitting en banc, corrects the standard which all judges of this panel believe to be erroneous
 
 
 [2]
 A "final decision" is reached only after the property owner seeks available variances and permits. Cf. Corn v. City of Lauderdale Lakes, 816 F.2d 1514, 1516 (11th Cir.1987) (Corn II ) ("Since the subject ordinances called for a complete moratorium on [development of the property], any request for a variance would plainly have been futile.")
 
 
 [3]
 If the state clearly provides no procedure for seeking compensation, however, the plaintiff need not repair initially to state court in order to satisfy the denial element. Eide v. Sarasota County, 908 F.2d 716, 720 (11th Cir.1990) (denial occurs when "there is no provision to award [the property owner] just compensation"), cert. denied, --- U.S. ----, 111 S.Ct. 1073, 112 L.Ed.2d 1179 (1991)
 
 
 [4]
 The Williamson Court relied on an analogy to Parratt to support its conclusion that a federal taking can occur only if "the State fails to provide an adequate postdeprivation remedy for the property loss." See Williamson, 473 U.S. at 195 & n. 14, 105 S.Ct. at 3121 & n. 14. The Parratt analogy suggests that upon return to the federal forum, after exhaustion of the state procedures providing for compensation, the plaintiff can challenge the adequacy of those procedures, but cannot relitigate the merits of the just compensation claim. Peduto v. City of North Wildwood, 878 F.2d 725, 728-29 (3rd Cir.1989) (interpreting Williamson, Fifth Amendment only requires fair procedures); Culebras Enters. v. Rios, 813 F.2d 506, 516 (1st Cir.1987) (the state need only afford "a reasonable, certain and adequate procedure for obtaining compensation"); Fountain v. Metropolitan Atlanta Rapid Transit Auth., 849 F.2d 1412, 1414-15 (11th Cir.1988) (collateral estoppel barred relitigation of just compensation claim). But cf. Fields v. Sarasota Manatee Airport Auth., 953 F.2d 1299, 1307-08 (11th Cir.1992) (applying res judicata, resolution of state court procedure precluded subsequent 42 U.S.C. § 1983 action based on the Just Compensation clause; stated possible exception to res judicata)
 Upon return to the federal forum, the plaintiff first challenges the adequacy of the state procedure providing the compensation. If the court determines that such procedure is adequate, the litigation ends. If the court finds that the state procedure is inadequate, however, the court then litigates the merits of the just compensation claim. That is, the court determines whether a taking has occurred, and if so, awards just compensation. As a practical matter, Williamson precludes litigation of the merits of a just compensation claim in federal court unless the state declines to provide adequate procedures through which an aggrieved party might seek compensation.
 
 
 [5]
 The Williamson court also seems to have been influenced by abstention concerns: "If [the property owners] were to seek [variances], a mutually acceptable solution might well be reached with regard to individual properties, thereby obviating any need to address the constitutional questions." Williamson, 473 U.S. at 187, 105 S.Ct. at 3117; cf. Railroad Comm'n v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); Fountain v. Metropolitan Atlanta Rapid Transit Auth., 678 F.2d 1038, 1046 (11th Cir.1982)
 
 
 [6]
 The continuing wrong doctrine may, as the district court believed, postpone accrual. See ante at 1491-93
 
 
 [7]
 The Ninth Circuit's Norco decision, from which Corn III adopted its expanded Williamson test, also provides no explanation. See generally Norco, 801 F.2d at 1145-46
 
 
 [8]
 The Corn III court incorrectly relied on MacDonald for the proposition that a federal cause of action is not available until after the state court determines the status of the property. In MacDonald, a separate mandamus action was pending in state court. Both the MacDonald majority and dissent, however, concentrated on whether the initial decisionmaker--rather than the state's judiciary--had reached a definitive position on the status of the property. See MacDonald, 477 U.S. at 353 n. 8, 106 S.Ct. at 2568 n. 8 ("The implication is not that future applications [for permits] would be futile, but that a meaningful application has not yet been made."); id. at 358, 105 S.Ct. at 2571 (White, J., dissenting) ("considered for takings purposes only the actual regulatory decision that had been made by the governmental decisionmaker")
 
 
 [9]
 For purposes of determining whether a state provides adequate procedures for obtaining just compensation, it is unclear whether we should look to the availability of just compensation remedies (1) on the date of the taking (i.e., when both Williamson elements can be satisfied), Williamson, 473 U.S. at 194, 105 S.Ct. at 3120 ("all that is required is that a reasonable, certain and adequate provision for obtaining compensation exist at the time of the taking " (references and internal quotations omitted, emphasis added)); Sinaloa Lake Owners Ass'n v. City of Simi Valley, 882 F.2d 1398, 1402 (9th Cir.1989) (for physical takings, date ordinance passes), cert. denied, 494 U.S. 1016, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990), or, viewing Williamson 's two prongs as essential elements of the cause of action, (2) at any time during the pendency of the claim in federal court, see Executive 100, Inc. v. Martin County, 922 F.2d 1536 (11th Cir.) (without citation to Eleventh Circuit precedent suggesting that Florida did not provide an adequate remedy at the time of the alleged taking of Executive 100's property, applied current Florida law to find that an adequate remedy existed and, therefore, that Executive 100's takings claim was not ripe), cert. denied, --- U.S. ----, 112 S.Ct. 55, 116 L.Ed.2d 32 (1991); cf. Greenbriar, 881 F.2d at 1573 n. 7 ("ripeness [of a just compensation claim] goes to whether the district court had subject matter jurisdiction to hear the case")
 
 
 [10]
 The record suggests two possible scenarios. The first scenario assumes that NPL could have, but did not, seek available variances or permits. See Fla.Stat. § 333.07(1), (2) (1989). Until NPL sought such relief, and that relief was denied, NPL's takings claims could not have accrued. Yet, the affect of the state circuit court's order quashing the zoning ordinance was to reinstate the prior, residential duplex zoning classification. With no further clarification possible, Williamson 's final decision requirement was satisfied. Under this scenario, therefore, NPL's takings claims would have accrued on the date of the circuit court's order, and, its claims would have been timely
 The second scenario assumes that it would have been futile for NPL to seek a variance or permit. This possibility is suggested by the state circuit court's "Final Summary Judgment" which found that the ordinance "enacted by defendant ... only permitted use [of the property] as a private airport." Record, vol. 5, at 1, no. 158-22. Moreover, Florida law restricts the availability of variances and permits to uses which do not create "airport hazards." Fla.Stat. § 333.07(1)(a); see also id. § 333.01(3) (defining "Airport hazard"); id. § 333.02 ("Airport hazards contrary to public interest"); id. § 333.07(2)(a) (variances must not be contrary to the public interest). Given the small size of the property, I cannot imagine how a residential development could coexist with an operating airport without creating such a hazard. If it would have been futile to seek a variance or permit, NPL's takings claims would have ripened when the planning authorities rezoned NPL's property, see Corn II, 816 F.2d at 1516, and assuming the district court correctly applied the "continuing wrong doctrine", the statute of limitations would bar NPL's federal claims.
 
 
 [1]
 As Winston Churchill said:
 I have derived continued benefit from criticism at all periods of my life, and I do not remember any time when I was ever short of it.
 
 
 [2]
 In First English Evan. Luth. Ch. v. Los Angeles County, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987), the Court held that where a landowner's property is taken by a land-use regulation, the Constitution requires payment of just compensation "for the time before it is finally determined that the regulation constitutes a 'taking' of his property." 482 U.S. at 306-07, 107 S.Ct. at 2381. In deciding that "temporary" regulatory takings entitle landowners to just compensation, the Court expressly defined temporary takings as "those regulatory takings which are ultimately invalidated by the courts," id. at 310, 107 S.Ct. at 2383, and explained that "[i]nvalidation of the ordinance ... convert[s] the taking into a 'temporary' one...." Id. at 319, 107 S.Ct. at 2388
 
 
 [3]
 This court had determined earlier that Corn's just compensation claim was ripe for federal review under the Williamson rule on the date the pertinent zoning decision was made. Corn v. City of Lauderdale Lakes, 816 F.2d 1514 (11th Cir.1987)
 
 
 [4]
 Chief Justice Marshall touched on a similar idea as he explained the inapplicability of his opinion in Marbury v. Madison to a later case, Cohens v. Virginia, by using these words:
 It is a maxim not to be disregarded that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used.
 Cohens v. Virginia, 19 U.S. 264, 399, 6 Wheat. 264, 399, 5 L.Ed. 257 (1821).
 
 
 [5]
 I understand that the precedential sweep of decisions and opinions of the United States Supreme Court may possibly be broader than those of lower courts; my comments are limited to the decisions of lower courts, such as our own
 
 
 [6]
 I think we could have decided Corn III without an opinion and Corn III 's precedential value would have been the same, although for some other cases this unity might not be true. We could have said in Corn III only that "The judgment of the District Court is AFFIRMED." If published, the decision would have precedential import. Considering that the Corn III appeal was only to decide whether the taking claim which was allowed by the district court ought to have been barred either by res judicata or by the statute of limitations, an affirmance of the district court judgment necessarily answered that the statute of limitations was no bar. This point is the holding of Corn III. And for me to write, accurately or inaccurately, about unnecessary legal propositions, such as ripeness and maturity, in the opinion would not (and does not) change or expand the scope of the holding as binding precedent
 
 
 [7]
 For good or for bad, opinion-writing judges--unlike legislators--can make cases decide no more than the cases present. For example, no matter how often or how plainly a judicial panel may put in its opinion that "we hold X," "X" is not law and is not binding on later panels unless "X" was squarely presented by the facts of the case and was a proposition that absolutely must have been decided to decide the concrete case then before the court. All readers of judicial opinions, but especially members of later judicial panels, have the right (for judges, the duty) to look beyond the words of an opinion in which a panel attempts to explain the reasons for its decision and to determine what was decided in reality. This process is, I think, largely what the study of law is about. And, despite my Chief's footnote one, the idea that a case is authority only for what it actually decides--that its authority does depend on "the fortuity of the actual facts" of the case--is not "odd," at least in the English-speaking world with its common law tradition. Nor do I believe it to be odd to recognize that some judicial decisions are correct even when the stated explanation for the decision is flawed. We are bound by the decisions of earlier panels of this court: like cases should have like results. We are not necessarily bound by the words of their opinions, although we may be persuaded by them even if not bound
 Thus, Corn III is part of the law of the circuit. But the principle that binds later panels is limited: the statute of limitations does not run in circumstances like those in Corn III. Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), always speaks of the binding power of earlier "decisions "--a view I wholeheartedly embrace--not of opinions, of general rules, or of judge-made "tests," "standards" or "guidelines." These latter things do advise future panels but do not, in themselves, command future panels. As I understand it, the Chief Judge's view of stare decisis considerably enlarges the customary view of this important concept. His view would absolutely require later panels not simply to follow earlier decisions, but to extend those precedents to cover materially different cases as long as the words of the earlier opinion point to a particular result in the later and different cases. One result of this approach is to put a premium on judges writing as broadly as possible in particular cases so as to give their point of view the broadest possible binding effect on later panels.
 
 
 [8]
 Rehearings en banc are costly, time-consuming affairs for litigants and for the court as an institution. Delay in final disposition is inevitable. The court ought not go en banc lightly. We have a high duty, I think, to reconcile decisions if possible before going en banc to resolve "conflicts," that is, "to secure or maintain uniformity of [our] decisions." See generally F.R.A.P. 35. This reconciliation is aided considerably by ignoring dicta and reducing each decided case to its exact holding as demonstrated by the actual disposition of the case given its facts. When we read cases as if every pronouncement in every opinion is law, the courts appear to produce many generalized "principles" that arise apart from the process of deciding an actual case; and there will be more errors, more conflicts, and more "law" about which various judges can disagree and think en banc rehearing may be needed
 Also, where one of our decisions plainly contradicts a Supreme Court decision, I believe no need exists for an en banc rehearing. The panel that sees the plain contradiction should follow the Supreme Court's decision. If that course and the resulting panel decision create controversy, then perhaps that decision would be the subject of an en banc poll.